## SIMPSON v. HYDE.†

No. 4374.

Court of Appeal of Louisiana. Second Circuit.

Dec. 16, 1932.

794

Hudson, Potts, Bernstein & Sholars, of Monroe, for appellant.

George W. Lester, of Monroe, for appellee.

McGREGOR, J.

This is a suit brought by the plaintiff to recover damages in the sum of $11,263.50 for personal injuries alleged to have been sustained by him as the result of being negligently run down by the defendant, driving an automobile. The pertinent allegations of the petition are:

(1) That the plaintiff resides in the parish of Ouachita, just west of the limits of the city of Monroe, on the Dixie-Overland Highway, in what is known as the Pine Crest subdivision.

(2) That on or about October 19, 1931, at about the hour of 9 o'clock a. m., he was walking on his way to his work, which was on the south side of the said highway; that he had crossed the said highway at a point where a driveway on the south side leads into the subdivision and had advanced into the said driveway a distance of about ten feet when he was suddenly overtaken and run down by an automobile driven in a westerly direction by the defendant.

(3) That the impact of the automobile hurled him through the air a distance of some twenty or more feet in a line about parallel with the highway and landed him in a ditch some several feet south of the highway.

(4) That as a result of said impact he was injured as follows:

(a) Left leg fractured below the knee.

(b) Left collar bone shattered.

(c) Left ankle sprained and ligaments torn and bruised.

(d) Scalp lacerated, and bruises and contusions all over the body.

(5) That he was confined to his bed six weeks; that he suffered great physical pain for several weeks; that he was compelled to wear a wooden T-brace or cross strapped to his back for five weeks; that at the time of filing the petition he was still suffering from his injuries; and that he was permanently totally disabled.

(6) That he itemized the damages claimed as follows:

| | |
|---|---:|
| Bill of St. Frances Sanitarium.... $ | 56.00 |
| Dr. Moore, X-ray pictures........, | 7.50 |
| Dr. W. E. Jones, professional services ......................... | 150.00 |
| Damages for loss of time—7 months at $150.00 per month.... | 1,050.00 |
| Damages for physical injuries, pain and suffering............. | 10,000.00 |
| Total | $11,263.50 |

(7) That the accident was due solely to the grossly careless, negligent, and reckless manner in which the defendant drove his automobile in driving on his left side of the road at a rate of speed in excess of fifty miles per hour and in not keeping a proper lookout ahead and in not having his car under control.

(8) That he (plaintiff) was in no way responsible for the accident, being approximately ten feet on the south side of the pavement when he was struck.

The defendant's answer in the main is a general denial of all negligence on his part and responsibility for the accident. After denying all the allegations of the plaintiff that charge him with negligence and responsibility, the pertinent allegations of the answer are:

(1) That he was driving his Buick automobile on the occasion in a westerly direction at a speed not to exceed the lawful rate of forty-five miles per hour.

(2) That when he first saw the plaintiff on the north edge of the highway, he (the plaintiff) was entering and preparing to cross it, and that he (defendant) thereupon blew his horn and plaintiff stopped and looked directly at him; that he immediately slowed down until he was driving at a rate of about fifteen miles per hour and pulled his automobile to the left in order to avoid running into plaintiff, who, by the time defendant had reached within twenty feet of him, had reached about the middle of the pavement; that plaintiff then began to run in an attempt to cross ahead of him (the defendant); that he then continued to pull his car to the left and applied his brakes the second time; that notwithstanding these efforts on his part, he struck the plaintiff at about two feet from the south edge of the pavement; and that his car went into the ditch.

(3) That the accident was in no manner

caused by any fault or negligence of his, but that the sole and proximate cause of the accident was the grossly negligent conduct of plaintiff.

(4) That plaintiff had failed to look and listen before attempting to cross the highway, or having observed the approach of defendant, deliberately careless of his safety, he foolhardily attempted to rush across the highway immediately in front of the defendant's automobile.

(5) That the plaintiff created a situation of emergency wherein it was necessary that immediate action be taken in order to avoid an impending accident; that he (the defendant) applied his brakes immediately upon perceiving the situation and pulled his car to the left, but that in spite of every effort on his part, his car struck the plaintiff from no fault or negligence of his.

(6) That in case it should develop at the trial that he was negligent in any manner, he pleaded in the alternative the contributory negligence of the plaintiff in failing to look and listen before crossing the highway and in attempting to cross when he either knew or should have known of the approach of the defendant in his car.

Upon the issues as thus made up the case was tried, and there was judgment in favor of the plaintiff for the sum of $5,213.50. A rehearing was granted, and in refusing to change his original findings, the trial judge handed down a written opinion in which he found the following facts:

(1) The plaintiff was crossing the highway from north to south, while the defendant was traveling west.

(2) The plaintiff was near the southern edge of the pavement, either just on or off, when struck by defendant's automobile, which hurled him several feet.

In the course of his opinion the trial judge held that plaintiff did not have to guard against traffic coming from the west (evidently meaning east) on the south side of the road except in case of passing cars; that he had, after crossing the center line of the highway, reached a safety zone as to cars approaching from the east. He held specially that the defendant did not have control of his car while on his wrong side of the highway without necessity, and that his negligence was the proximate cause of the injury.

The defendant has appealed, and the plaintiff has answered the appeal and asks that the judgment be amended by raising the amount to the sum of $11,263.50, as originally prayed for.

#### Opinion.

In their brief counsel for the defendant admit and concede the negligence of the defendant, but urge the contributory negligence of the plaintiff, so that this is the first question to be determined. If this defense is established, it will then be unnecessary to determine the nature and extent of plaintiff's injuries. If it is not established, then of course it will be necessary to determine the nature and extent of the injuries and the amount of damages to be awarded.

To determine the question of contributory negligence, we are dependent almost solely upon the testimony of the plaintiff, the defendant, and Miss Maxine Haney. The plaintiff introduced quite a number of witnesses who did not see the actual collision between defendant's automobile and the plaintiff, but saw them separately just a second before, and could not see the plaintiff at the moment of the collision for the reason that in the position in which they were the defendant's automobile was between them and the plaintiff.

The testimony in the case is voluminous, and we have been most ably assisted in our study of it by copious and splendidly written and compiled briefs on both sides.

The accident in question happened at, in, or near a graveled highway on the south side of the paved Dixie-Overland Highway, which driveway is known as the Fox driveway and leads south to the Fox Hatchery. There is a culvert across the driveway parallel with the highway, some eight or ten feet south of the edge of the pavement. This culvert takes care of drainage running east and west, and at each end of it the ditch must be two or three feet deep.

Some five or six hundred feet east of this driveway, at a curve in the highway, on the north side there is located a filling station and a group of small houses, all known as the Dixie Tourist Camp. Just a few feet east of this driveway on the north side there is another filling station known as Haney's Filling Station. Plaintiff was attempting to cross the highway from the north to the south side, somewhere near the Fox driveway, on foot, and the defendant was traveling in an automobile coming from the east from the direction of the Dixie Tourist Camp.

To get the plaintiff's version as to how and when the accident occurred, we quote from his testimony when being examined in chief:

"Q. Whereabouts on the highway, or near what place of business or residence on the highway, did this accident occur? A. It occurred almost south of Mr. Haney's filling station, just a little south and east and in the Victor Fox driveway.

"Q. That driveway was a driveway leading from the Dixie-Overland Highway to Mr. Fox's place of business? A. Yes, sir.

"Q. At what point, with reference to the Victor Fox driveway, did you attempt to cross the Dixie-Overland Highway? * * * A. Just north, just opposite the Victor Fox driveway.

"Q. How did you reach that point, Mr.

Simpson, coming from your home? A. I walked on the shoulder from the Dixie Tourist station up to this point.

"Q. On which side of the highway? A. North side or right side.

"Q. Mr. Simpson, before you started to cross the highway what did you do? A. I looked east—I first looked west to see if I had a chance to make it over to the south side; and looked east to see if my way was clear, then I started on across.

"Q. Did you see any cars coming from the west? A. No, sir.

"Q. Did you see any cars coming from the east? A. Yes, sir.

"Q. What was the approximate place of the car that you saw coming from the east? How far from you was the car that was coming from the east when you started across there? A. I judge in the neighborhood of 500 feet or better anyhow. It was about opposite a little sign on the north side of the road below the Dixie Tourist Camp.

"Q. Below the Dixie Tourist Camp? A. Yes, sir.

"Q. When you say below, do you mean south and east? A. I mean east, just at the curve. The curve starts just east of the Dixie Tourist Camp. Just coming into the curve.

"Q. You saw the car just coming into the curve east of the Dixie Tourist Camp? A. Yes, sir.

"Q. What did you do, did you immediately proceed across the road or did you wait there? A. No, sir, I went on across.

"Q. What was the next thing that called your attention to Mr. Hyde's car? A. Well, I heard a roar of a motor. It didn't sound like an automobile to me but to make myself sure I looked west because I was in some danger if anything was coming from the west and knowing this car was coming around the bend from the east. And about the time I got to the middle of the south half of the pavement —about middle ways from the south edge of the pavement and the black line, I heard this peculiar noise but I didn't hear anything from the east and I looked west and then throwed my head around to the east because there was not anything coming from the west. And he was then about twenty-five or thirty steps from me—sixty or seventy-five feet, headed right at me. And of course I started to run and the second step I made I hit the curve in the driveway. There was two little ditches—

"Q. Wait a minute. Let's locate again your position on the paved highway when you heard this noise that attracted your attention? A. Well, I was about half way between the black line and the south edge of the pavement.

"Q. That's when you heard this noise? A. Something near that. I only made two jumps.

"Q. When you heard this noise did you stop or did you continue on across the highway? Did you continue walking? A. No, I run.

"Q. When you heard this noise, first heard the roaring sound, did you stop to look to see what it was or continue to walk? A. I continued to walk until I satisfied myself he was coming and then I run.

"Q. Then you ran? A. Yes, sir.

"Q. How far from the south side of the pavement would you say you had gotten into the Victor Fox driveway before the car struck you? A. About six feet or maybe seven. * * *

"Q. If you were at the point 10 and started up into the driveway and he was coming towards you and turned into the driveway how could he hit the culvert, stop his car, which the evidence shows happened, and then hit you if you ran from point 10 into the driveway? A. The car hit me in here and bounced up and swung around.

"Q. His car hit you after it bounced up in the driveway? A. As it bounced up it picked me up.

"Q. He hit the culvert first and his car bounced on to the driveway where you ran for safety and hit you? A. The front end of it.

"Q. But he didn't hit you until after he hit the culvert? A. He hit the culvert first.

"Q. He hit the culvert first? A. Yes, sir.

"Q. Did you see him hit the culvert before he hit you? A. He had to because he come in this direction and I was over here.

"Q. Don't you know as a matter of fact when he hit the culvert his car stopped and that the story you are telling here is impossible because he couldn't hit you after he hit the culvert, when his car stopped at the culvert and you were beyond the culvert? A. The car come up in here, the front end of it.

"Q. You going to swear to that are you? A. Already swore it.

"Q. You swear absolutely he hit you with the front end of his car after he struck the culvert and his car bounced up on top of the driveway? A. The front end did, yes sir."

It is an admitted fact that defendant's car was traveling at a pretty rapid rate and plaintiff was aware of that fact from the time he first saw him some five or six hundred feet east. On this point he said:

"Q. When you looked up there and saw that car coming did it strike you that that car was coming along pretty fast? A. Well, I was satisfied he was traveling pretty fast."

The defendant's version of how the accident occurred is told in the following excerpts from his testimony:

"Q. When was the first time that you saw the plaintiff, Mr. Hyde? A. The first time I saw Mr. Simpson was as I was rounding this curve—rather a sharp curve—I was coming around at probably a speed of forty or forty-

five miles an hour. I saw Mr. Simpson as he stepped on the pavement—looked like he was probably three or four feet out on the pavement. I blew my horn and Mr. Simpson stepped and turned around—he kinder had his back to me like this—he stopped and turned around and looked and I blew my horn again and turned to the left. He stepped up again and I blew my horn again and he ran diagonally across the highway.

"Q. When you first saw Mr. Simpson on the north side of the highway how far were you from him? A. Oh, I imagine I was when I saw him the first time I was probably 150 feet probably. A hundred feet easily.

"Q. A hundred feet? A. Yes, sir.

"Q. Now, when he entered the highway did he continue right on across the paved portion of the road? A. No, he stopped. When he entered the highway I blew my horn and he turned around and looked at me and stopped and I cut to the left like that and slowed down to probably fifteen miles an hour and could have stopped entirely if I had even dreamed about the man going to run in front of me. But he seemed to lose his head, got excited and ran diagonally across the road.

"Q. After you blew your horn and he stopped how far was your car from at that time? A. Oh, probably fifteen or twenty feet.

"Q. Were you driving at the rate of forty-five miles an hour up to within fifteen or twenty feet? A. No, as quick as I saw him I started to slow down.

"Q. You begun to slow your car down a hundred feet before you got to him? A. Yes, I slowed down like and he had already stopped and of course I released my brake and was going on around. And had he stayed in the position where he was when I blew my horn I never would have hit him. * *. *

"Q. State what you did and what Mr. Simpson did, and how this accident occurred? A. The minute I saw Mr. Simpson on the highway he seemed to be walking slowly across there in kinder of a diagonal direction, going kinder sideways; and as quickly as I saw him I blew my horn. When I did Mr. Simpson stopped some three or four feet from the north side of the pavement, turned around and looked at me. So I pulled to the left and immediately applied my brakes and slowed down. I was probably making forty or forty-five miles an hour coming around the curve. Immediately applied my brakes when I saw him; then he stood right there and when I got within probably fifteen or twenty feet of him—I immediately started turning to the left as quickly as I saw him standing there, in order to pass him—which I could have done with five or six feet to spare—gradually cut to the left like that, and got to within fifteen or twenty feet of him and he started running directly in the direction he was originally headed."

Miss Maxine Haney testified that she looked at plaintiff and defendant just before the accident and saw it plainly. She could do this, for she was sitting at the front of the Haney Filling Station on the north side of the highway and west of the scene of the accident. In her testimony she said in part as follows:

"Q. What was Mr. Simpson's position on the highway with reference to the middle line down the center of the highway? A. Right in the center. Right by the black line.

"Q. You mean on the black line? A. Right by the center where the black line is.

"Q. Was he standing still when you saw him on the black line—standing on that line? A. I would not say he was standing exactly on it. Was in the center of the pavement.

"Q. Was he in motion or standing still? A. Standing still.

"Q. Is it your testimony Mr. Simpson was standing on the black line in the middle of the highway, and that the car was approaching him on the south side of the highway, and was real close to him, and that Mr. Simpson ran in front of the car? A. Yes, he started running when the car was coming on the south side of the road and hit him.

"Q. Are you positive of that? A. Yes, sir.

"Q. You saw that yourself? A. Yes, sir.

"Q. And the car picked him up on the pavement and he lodged on some portion of the car but you don't know what part? A. Yes.

"Q. And carried him until it ran into the culvert and then threw him off? A. Yes, sir.

"Q. And you saw all that? A. Yes, sir.

"Q. Where did it throw him to? A. In the ditch.

"Q. Was that up the driveway by the Fox driveway or up the main highway? A. Up the main highway."

It will be seen from the plaintiff's testimony that he contends that the point where he started across the highway is directly opposite the middle of the Fox driveway and that when he was struck he was near the middle of the driveway near the culvert.

Two facts are, of course, admitted by every witness, viz.: (1) Defendant struck the east end of the culvert with his left front wheel and fender and shattered the culvert and came to a standstill soon thereafter with part of his car in the driveway and the rear end pointing to and nearly reaching the concrete pavement. (2) He struck plaintiff either before or after he struck the culvert. As to whether the plaintiff was struck before or after the defendant's car struck the east end of the culvert and shattered it with the left front wheel, and as to where the plaintiff was at the moment when he was struck, the only three witnesses who could know differ in their testimony. They are all honestly trying to tell the truth, but the accident happened so suddenly and unexpectedly, and there was so

much excitement at the time, it is no surprise that they differ in the details of their testimony.

Miss Maxine Haney, who was sitting in the front of Haney Filling Station just north of the highway and a few feet west of the point opposite the Fox driveway, had a clear view of the entire accident. It is her testimony that the plaintiff was struck at a point on the pavement and about one foot from the south edge. She also testifies that this point was not immediately opposite the Fox driveway, but was a short distance east. Furthermore, she is very positive that when the right end of the bumper struck him it picked the plaintiff up and carried him until the left front wheel of the car struck and shattered the east end of the culvert, and that the sudden stop of the car caused the plaintiff to be hurled through the air westward to a point in the ditch.

The plaintiff says that when he realized he was in danger of being struck he immediately began to run south trying to avoid being run over, and that the defendant, in his excitement, kept pulling his car to the left, and finally struck the east end of the culvert with the left front wheel; that the car then jumped out of the ditch upon the driveway and struck him right about the middle of the driveway just before he had reached the culvert; and that this impact is what hurled him to the point where he fell in the ditch and where he was subsequently picked up.

The defendant gives still a different version. He says that the plaintiff was going in a diagonal path across the road, and that while he was just on the south edge of the pavement at a point a short distance east of the driveway, he struck him, and that that impact hurled the plaintiff to the point where he landed in a ditch; that at the moment of the collision, in a desperate effort to avoid it, he cut his car so sharply to the left he almost turned it over; that he continued on until he came to a stop partly in the driveway with his left wheel striking the east end of the culvert.

By referring back to the testimony of the defendant quoted above, it will be seen that he testified that when he first saw the plaintiff walking on the pavement he blew at him and checked his car, and that he (plaintiff) apparently stopped about the center of the road; that, seeing the plaintiff stop, he released his brake and proceeded to turn to the left to avoid striking him; that immediately the plaintiff then started running and he (the defendant) used his brakes again in a final effort to avoid the collision. In this statement the defendant is absolutely corroborated by several witnesses of the plaintiff who testify that they found skid marks made by the defendant's car in the exact place where he said he first slowed down, and also at the other point where he says he had reached when the plaintiff left the middle of the road and started to run. Furthermore, the defendant is corroborated in the statement about the plaintiff stopping in the middle of the road by Miss Haney, who testified positively that she saw the plaintiff stop just as the defendant says he did.

Miss Haney is mistaken in a part of her testimony when she says that the plaintiff's body rode the bumper of the car until the end of the culvert was struck. If this were true, plaintiff's body would have been hurled in a southwesterly direction on down the driveway. Plaintiff also is mistaken in his testimony when he says that he was struck by the car after the left wheel had dropped in the ditch and shattered the end of the culvert and after the car had jumped out of the ditch upon the driveway. This cannot be, for if indeed the left wheel ever jumped out of the ditch the car had lost its momentum by the impact with the culvert and could not have hurled the plaintiff to where he fell or even in that direction. The defendant's version of just how the collision occurred is the most reasonable, and we think that he has related the details of the occurrence as accurately as could be done.

The testimony is so voluminous that it would be impossible to review it all. We have contented ourselves with reviewing that of the plaintiff, the defendant, and Miss Haney. We have carefully read and analyzed the testimony of all the other witnesses, and in the main it all is in harmony with the analysis we have given of the above-named three witnesses' testimony.

Put in as few words as possible, we think the testimony justifies the following statement of facts as having been established: Defendant was traveling in a westerly direction on the Dixie-Overland Highway at a speed of not over fifty miles per hour. As he was entering the curve in the highway at the Dixie Tourist Camp, about five hundred and seventy-five feet from the scene of the accident, he possibly saw the plaintiff walking along the north edge of the pavement some several feet east of a point opposite the Fox driveway. He also quite likely saw him at about that time enter upon the pavement as if to cross it diagonally toward the driveway. When he had reached within one hundred or one hundred and fifty feet of where the plaintiff was, the plaintiff was on the right or north half of the pavement. Defendant blew at him and used his brakes and plaintiff stopped near the center of the road. This indicated to the defendant that he was going to let him pass, so he released his brakes and pulled further to the left to pass in front of the plaintiff, a most natural thing to do. But at about that time the plaintiff became suddenly excited and began to run southwesterly toward the driveway. Defendant was already pulling his car to the left, so he could not change instantly to the right. His only chance to save the plain-

tiff was to pull to the extreme left as quickly as possible. But just as he had made this sudden left swerve he had reached the plaintiff and struck him with his right bumper and light. This impact right on the edge of the pavement, either on it or off it, immediately catapulted the plaintiff through the air to the point where he fell, and the car proceeded on and struck the culvert and came to a sudden stop. Plaintiff's body did not ride the bumper to this point, for if it had he would have been catapulted to an entirely different point.

Plaintiff testifies that he was just entering the pavement to cross it when he first saw the defendant's car coming from the east at a distance of five hundred and seventy-five feet away, at the Dixie Tourist Camp, and that at that point he (plaintiff) was directly opposite from the middle of the driveway. He also says he proceeded to walk straight across and never loitered. This cannot be true, for if it were it would have been impossible for the defendant ever to have caught up with him and struck him as he did. At any rate, he says that as he entered upon the pavement he looked to the west and saw no car. He then looked to the east and saw defendant coming at a rapid rate. That should have been a danger signal for him, but he paid no heed to it. He apparently forgot all about the defendant and his car. He was perfectly oblivious of the fact that a car was coming from that direction. He says that when he was about halfway across the pavement he heard a noise and thought it must be a car, so he looked to the west and saw defendant. He should have known that the noise was that of defendant's car coming from the east. After seeing there were none coming from the west, he looked to the east and saw the defendant's car close to him. From this point the stories differ. He says he did not stop but immediately began to run. Defendant says he stopped in the middle of the road, and Miss Haney says the same thing. We agree with them and believe that he did stop.

■ Plaintiff's entering upon the highway when he knew a car was coming toward him and then forgetting all about its existence was negligence, and this act alone was either the proximate cause of the accident, or, to say the least, contributed to it to such an extent as to bar his recovery of damages. Furthermore, when he arrived at the middle of the pavement and stopped, he justified the defendant in believing that he would stand still until all danger was over. Then when he started running he created an emergency for which he alone was responsible. Defendant was justified in acting in this emergency as best he could, and he is not liable for having erred in his judgment, if it can be said that he did err.

■ In his written opinion the trial judge held that the defendant did not have the proper control of his car. In this finding we think he erred. Defendant saw the plaintiff some one hundred or one hundred and fifty feet away and slowed down sufficiently; then when the plaintiff stopped, defendant was justified in starting up again as he did. He says that if he had even dreamed that plaintiff would not stand still he could have come to a perfect stop before he reached him.

Counsel for plaintiff has cited us to a large number of authorities, but they all fail in their application because of the fact that plaintiff himself caused an emergency and was himself careless of contributory negligence. The citations are all good law, but they do not apply to the state of facts as we find them in this case. It would be useless to undertake to analyze the various authorities cited. It would be too taxing upon us in the writing of the opinion and too taxing upon those who read it.

■ We find that the plaintiff did not exercise the care of an ordinary prudent person in attempting to cross the highway. If he had done so, the accident would not have occurred. He knew, according to his own testimony, that the defendant was approaching him at what he called a pretty fast rate. Under those circumstances it was his duty to use special precaution. He did not do this, but on the contrary he forgot the car until, according to his version, it was too late. If he had been alert concerning the coming of the defendant's car, he could and would have avoided the accident. He ought to have done one of three things, viz.: He should have waited on the north side of the pavement until the defendant had passed, or (2) he should have waited in the middle of the road until the danger was over, or (3) he should have crossed in a hurry in order to get over before defendant reached him.

Having reached the conclusion that we have, it becomes unnecessary to discuss the nature or extent of the plaintiff's injuries or any quantum of damages.

For the reasons assigned, it is ordered, adjudged, and decreed that the judgment appealed from be, and the same is hereby, reversed, annulled, and set aside, and that the plaintiff's suit be dismissed and his demands rejected, with the costs of both courts to be paid by the plaintiff and appellee.

DREW, J., dissents.