## HULDA ANDERSON v. MAURICE KELLEY.[1]

March 13, 1936.

No. 30,551.

W. S. *Foster* and R. C. *Andrews,* for appellant.

*Cobb, Hoke, Benson, Krause & Faegre, Paul J. McGough,* and *Nathan A. Cobb,* for respondent.

DEVANEY, CHIEF JUSTICE.

This is an action by the widow of Alfred Anderson to recover damages for his death, alleged to have been caused by defendant's negligent operation of his automobile. At the close of plaintiff's case defendant was granted a directed verdict, and from an order denying plaintiff's motion for a new trial this appeal was taken.

[1]Reported in 265 N. W. 821.

As is common in negligence cases, the two questions presented for review are: (1) Whether there is sufficient evidence of defendant's negligence to take the case to the jury, and (2) whether the evidence of decedent's contributory negligence is such as to preclude a jury issue in respect thereof.

Plaintiff's intestate, a man in good health and possessed of the mental and physical qualities common to a working man of his age (he was 55 years old when killed), resided upon a farm about two miles south of Milaca, his house being near a township road which, a short distance to the east of his farm, intersects with state trunk highway No. 18. It was his custom to use this highway when going to Milaca, to which place he frequently went. On the day in question, about four o'clock in the afternoon, he started to walk from his home with a pail of eggs, intending to go to Milaca. He had reached the trunk highway and had crossed over to its east side and was proceeding northerly upon the shoulder. The highway is straight and runs through a fairly level piece of country. The day was bright and warm. Atmospheric conditions were ideal. He had gone only a short distance north of the intersection when he evidently intended to cross back to the westerly side, perhaps realizing that he should face traffic. He had almost reached the center line when he evidently became aware that a car, driven by one Hilmo, was rapidly approaching him from the north. Defendant's car was approaching from the south. Anderson became bewildered. He was between two fast-approaching cars. Therefore it is not surprising to find that both Hilmo and his wife described his mental condition as being indicative of one who was badly excited. Mrs. Hilmo, who was riding with her husband in the front seat of the car approaching from the north, testified:

Q. "Will you tell the court and jury what you saw at that time?

A. "Well, we were driving south of Milaca and I was sitting in the front seat, reading a magazine. I heard an automobile blow its horn. That drew my attention. And my husband blew his horn also. The first thing, there was a man in the middle of the pavement, standing there swaying back and forth, undecided what to do. And he was on the other side of the black line, on Mr. Kelley's side,

when Mr. Kelley hit him, and threw him up into the air, and he come bouncing and spinning just like a top, then landed on the shoulder, and our car—my husband stepped on the brakes and drove our car into the ditch.

Q. "Was Mr. Anderson walking or standing still at the time that you first saw him?

A. "Well, he was swaying back and forth.

Q. "How?

A. "Swaying back and forth and undecided what he was to do.

Q. "Where was he then?

A. "Well, it was on Mr. Kelley's side of the black line, on the east side of the black line.

Q. "How far?

A. "Oh, I should judge about a foot.

Q. "About a foot on the east side of the center line of the pavement?

A. "Yes.

\* \* \* \* \*

Q. "Did he seem to be excited?

A. "Very excited.

\* \* \* \* \*

Q. "He was hesitating on his feet, as if undecided to go across the road or return, is that it?

A. "Yes, looking our way and looking Mr. Kelley's way.

Q. "Did he look in both directions?

A. "Yes, he did.

\* \* \* \* \*

Q. "Did he move his feet any from where he was to the east, on Mr. Kelley's side of the center line, that you saw?

A. "Not that I noticed."

Mr. Hilmo testified:

A. "No, I didn't notice Mr. Anderson until he was on the pavement.

Q. "How far into the pavement was he when you first noticed him?

A. "Why, he may have been taking his first step. I wouldn't say for sure.

Q. "Was he walking rapidly or running?

A. "Yes, he was kind of running, running or making steps across there. He wasn't walking.

Q. "Did you notice whether or not he looked in the direction of Mr. Kelley's car?

※　　※　　※　　※　　※

A. "I couldn't say for sure. I think he was looking the other way.

Q. "Toward you?

A. "Toward Mr. Kelley's car.

Q. "When you saw him?

A. "When I first saw him, I think he did.

Q. "Where was he then? Was he on the pavement or on the shoulder?

A. "He was on the pavement.

※　　※　　※　　※　　※

A. "He was going to get across that road there.

Q. "Was he taking long strides?

A. "I couldn't say. He was kind of running across there, yes.

Q. "Or was he taking short steps, which?

A. "No, he wasn't running—he was kind of an elderly man, I guess.

Q. "How fast would you say he was moving?

A. "I think he was moving the best he could. ※　※　※ If he run over on my side, I would have been able to stop; he would have been all-right, I think.

Q. "If he had run across?

A. "Yes, if he had run across.

※　　※　　※　　※　　※

Q. "Can you say how long it took for Mr. Anderson to walk from that point on the pavement, or to run from that point on the pavement where you first saw him, to the center of the pavement?

A. "No, that was just a fraction of no time.

Q. "How long did he stand there hesitating?

582

A. "He didn't stand there. He was moving right along.

\* \* \* \* \*

A. "Well, it would be a fraction of a second. When he was hit he was in a position like—kind of stooped position a little bit when he was hit; either he was in a motion there, running, or what?

Q. "How far would you say he was bent over from an upright position?

A. "That I couldn't say. When he was hit in the back there that straightened him out."

Mr. Hilmo further testified:

Q. "Now, at the time of the impact Mr. Anderson's body was spun, as you said, directly across the pavement in the path of your automobile, was it not?

A. "Yes, he spun forward, so he was really in the lying position, rolling, when he went off from the pavement onto the shoulder.

Q. "Well, how far would you say that Mr. Anderson's body was spun forward or to the north before it rolled over in front of your car?

A. "Oh, quite a ways.

Q. "About how far? A car length?

A. "He was up in the air, I think about five feet at one time.

Q. "Yes, but what I am getting at is his northward movement, toward Milaca.

A. "From the time he was hit until he rolled off I judge that would be about 30 or 40 feet. I couldn't say for sure.

\* \* \* \* \*

Q. "At any rate, would you say that the body from the force of the impact, Mr. Anderson's body, moved to the north some 30 or 40 feet?

A. "Yes, before it rolled to the side.

Q. "Before it rolled to the west?

A. "Yes, something like that."

Defendant was driving rapidly. The witness Hanson testified that after Anderson had been struck and killed and after the sheriff and coroner had been brought out to the scene of the accident de-

fendant told the sheriff that he was sorry that the accident had occurred; that he was driving a little fast, about 55 miles an hour. There is also testimony to the effect that defendant "didn't turn one way or the other" when he came close to where Anderson was standing. It thus will be observed that decedent came to his death within a foot of the center line of the paved highway. This pavement, 20 feet in width, with dirt and graveled shoulders in fine condition, each about 10 feet in width, would seem to have furnished a reasonably prudent driver ample room to turn out of his way so as to leave the traveler safe from injury. The high rate of speed of defendant's car and his failure to observe Anderson and turn his car is what brought about this dangerous situation. It therefore seems clear that the question of defendant's negligence is amply shown.

The remaining question is whether the facts related established as a matter of law that decedent was contributorily negligent so as to preclude his administratrix from recovering a verdict. Neither defendant nor any occupant of his car testified. The court was of opinion that "there was negligence, and gross contributory negligence on the part of the decedent," and for that reason directed a verdict for defendant when plaintiff rested.

The guiding principles applicable to the situation here appearing are adequately set forth in Jasinuk v. Lombard, 189 Minn. 594, 596-597, 250 N. W. 568, 569:

"In the record is the testimony of three eyewitnesses of the accident. All appear to have been from 150 to 160 feet distant from the scene. It was for the jury to determine the accuracy of their observations and the credibility of the resulting testimony. The court in its charge gave plaintiff the benefit of the presumption that decedent was not contributorily negligent. It is now urged for appellant, citing 17 C. J. 1304, that the presumption 'does not apply where there are eyewitnesses to the accident, or where the surrounding facts and circumstances show to the contrary, or where plaintiff's evidence suggests contributory negligence on the part of deceased.' In so far as it makes the presence of eyewitnesses alone

an insurmountable obstacle to the presumption, that statement is wrong.

"At the threshold of consideration lies the important fact that, on the issue of contributory negligence, defendants had the burden of proof. The presumption against contributory negligence is highly important to plaintiff unless for some reason he is denied its benefit as matter of law. He is not, simply because the evidence as a whole fails to demonstrate that decedent was negligent. The testimony of eyewitnesses might be such (it is not here) as to annul the presumption, but their mere presence is no bar to its consideration by the triers of fact. Neither number nor kind of witnesses is the test, but rather the state of the evidence when the case goes to the jury. Unless, by demonstration of physical facts or otherwise, contributory negligence then appears as matter of law, the jury takes the case upon all the evidence and all inferences (the presumption in question is only an inference which the law permits from appropriate facts, 2 Dunnell, Minn. Dig. [2 ed.] § 3431) which are reasonably to be drawn from them. 'The question of contributory negligence in such cases is always one for the jury, unless the evidence shows such negligence conclusively.' 2 Dunnell, Minn. Dig. (2 ed. & Supp.) § 2616. The cases cited in support are too numerous for further reference here. The latest is Aubin v. Duluth St. Ry. Co. 169 Minn. 342, 343, 211 N. W. 580, where, because in effect it required a degree of proof beyond a fair preponderance, we held it was error to charge that the presumption against contributory negligence must yield to 'clear proof' to the contrary. Bowers v. C. M. & St. P. Ry. Co. 141 Minn. 385, 170 N. W. 226, was an eyewitness case, but the presumption against contributory negligence was held applicable notwithstanding. So there is nothing in this case to deprive plaintiff of the benefit of the presumption against contributory negligence, and there was no error in the charge on that point."

Decedent was clothed with the presumption that at the time of and immediately preceding the accident he was in the exercise of due care. Necessarily, then, that presumption also included that he exercised ordinary care for his own safety; that he looked before

entering upon the concrete pavement for the purpose of crossing the same. See Quinn v. Zimmer, 184 Minn. 589, 593, 239 N. W. 902.

We all have some experience respecting the difficulty of judging the speed of an approaching car. Anderson had a right to assume that the driver was proceeding in a lawful manner and at a reasonable rate of speed. When he came to the black center line of the highway he suddenly became aware that the car approaching him from the north was getting so near that he was in serious danger of being hit if he were to go across. That accounts for his excitement and swaying motions. It seems to us that this situation created an emergency, not of decedent's making, but rather and only because of the speed of the drivers upon this highway, especially that of defendant. Under such circumstances the rule is:

"Where, through the negligence of another, a person is suddenly placed in a position of great and imminent peril in which he is compelled, in a state of fear, excitement, and bewilderment, and under distracting circumstances, to act instantly in an endeavor to escape, he is not chargeable as a matter of law with contributory negligence if he puts himself into a position of still greater peril and is injured." 4 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) § 7020.

The speed mania is the basic cause for a human death toll now justly considered of grave public concern. As the jury are under our form of trial procedure the exclusive judges of all questions of fact, including as well the inferences to be drawn therefrom, the facts and inferences establishing contributory negligence must be made to appear in such fashion as to leave no reasonable doubt in the mind of the judge that the field of the jury cannot embrace the particular facts presented in the case then being heard. In this field we, as judges, should not enter, nor should we sit as a super-jury. Our own sense of self-restraint requires that we refrain.

The order is reversed.

HILTON, JUSTICE (dissenting).

I dissent.

586

LORING, JUSTICE (dissenting).

"Our own sense of self-restraint" should not excuse us from performing the duty which the law imposes upon this court. The duty to say whether or not there is a question of fact for submission to a jury must lie somewhere if the jury system is to survive in the administration of justice. Under our system that duty is imposed on the trial court, subject to review here. The fulfilment of that duty does not make this or the trial court a "super-jury," because we do not pass upon questions of fact. Our duty lies in another field. We simply say whether reasonable minds might differ as to the inferences to be drawn from the facts in evidence. No question of "reasonable doubt" is involved.

I think that the trial court was right in concluding that no question of fact was here presented. The presumption of due care does not survive, but vanishes, when all the facts are shown by undisputed evidence. Here there were two witnesses who saw the whole occurrence in broad daylight without anything to distract their attention. The highway was straight and level. Anderson either failed to look or ignored the approaching cars. Defendant's speed of 50 to 55 miles an hour under the conditions was as a matter of law not unreasonable as long as plaintiff was walking on the shoulder. To say that it was would be to ignore everyday experience and practice of prudent drivers.

Conditions here, in my opinion, conclusively rebutted the statutory presumption. To hold otherwise would be to ignore all the progress that has been made in perfecting cars and roads. Here was no speed mania to be judicially deplored. Defendant's fault, if any, was in failing to swerve to the right sufficiently to avoid Anderson, who had got to the center line and appeared to be confused. But to say that defendant's speed led Anderson into the place of danger is to rest judicial opinion on altogether too tenuous a reason. Anderson, without first ascertaining if the movement could be made in safety, attempted to cross a main trunk highway upon which traffic might well be expected from either or both directions. He voluntarily placed himself where cars must necessarily pass close to him. He succeeded in crossing defendant's

lane of traffic in safety, so it must be conceded that any possible miscalculation of defendant's speed did not affect his action. No act of defendant led him into the position which confronted him with an emergency, and hence defendant was not responsible for his lack of discretion while so confronted. Anderson v. Davis, 151 Minn. 454, 457-458, 187 N. W. 224, and cases therein cited. As the majority say, it was the appearance of Hilmo's car that frightened Anderson and caused his confusion. Had he continued across, the evidence shows he would have survived. Instead he became bewildered and did the most hazardous thing he could have done. He changed direction and stepped back in front of defendant's car just in time to be hit. Had he stayed in the center or continued his course he could have been easily avoided by both cars. I cannot see how reasonable minds could acquit him of negligence in placing himself between the oncoming cars as near as these were, much less in suddenly changing direction and stepping back into defendant's lane of travel. Pedestrians of ordinary prudence do not do such things. Goodson v. Schwandt, 318 Mo. 666, 300 S. W. 795; Simpson v. Hyde (La. App.) 144 So. 793.

In the Goodson case the syllabus states [318 Mo. 666]:

"Where it is clear from the evidence that at the instant the pedestrian, attempting to cross an east-and-west street from its south side, discovered that he was in danger of being run over by a westbound automobile, he was out of the path of defendant's eastbound truck, and becoming confused, suddenly jumped back towards the south and was instantly struck by the corner of the truck's left fender, his jumping back was the proximate cause of his injuries, and there can be no recovery of damages from defendant on account of his injuries."

In the Simpson case [144 So. 799] the court said:

"Plaintiff's entering upon the highway when he knew a car was coming toward him and then forgetting all about its existence was negligence, and this act alone was either the proximate cause of the accident, or, to say the least, contributed to it to such an extent as to bar his recovery of damages. Furthermore, when he arrived

at the middle of the pavement, and stopped, he justified the defendant in believing that he would stand still until all danger was over. Then when he started running he created an emergency for which he alone was responsible. Defendant was justified in acting in this emergency as best he could, and he is not liable for having erred in his judgment, if it can be said that he did err."

STONE, JUSTICE, concurs in the opinion of Mr. Justice Loring.